# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 19-1396V
UNPUBLISHED

|  |  |
|---|---|
| MICHELE MULLOY,<br><br>　　　　　　　　Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: February 21, 2023<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Leah V. Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Katherine Carr Esposito, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On September 12, 2019, Michele Mulloy filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration (SIRVA) resulting from adverse effects of an influenza ("flu") vaccine she received on October 31, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"), and although entitlement was conceded, the parties could not resolve damages on their own.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$229,388.06, representing $205,000.00 for past pain and**

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**suffering, $16,688.12 for future pain and suffering (based on an award of $900.00 per year, discounted to present value), and $7,699.94 for past unreimbursed expenses.**

## I.     Relevant Procedural History

Approximately a year and a half after this case was initiated, Respondent filed his Rule 4(c) Report conceding that Petitioner was entitled to compensation. ECF No. 26. A ruling on entitlement was thereafter issued on May 5, 2021 (ECF No. 27), and although the parties attempted to informally resolve damages, they could not do so. ECF No. 39, 41. On June 1, 2022, I issued a scheduling order regarding the briefing of disputed damages issues. ECF No. 44. The parties filed their respective briefs (ECF Nos. 46 ("Br."), 47 ("Opp."), and 50 ("Reply")). The parties also agreed to argue their positions at a Motions Day hearing, at which time I would decide the disputed damages issues. ECF. No. 52. That hearing was held on January 27, 2023,[3] and the case is now ripe for a determination.

## II.     Relevant Medical History

A complete recitation of the facts can be found in the Petition, the Rule 4(c) Report, and the parties' respective pre-hearing briefs. In summary, at the time of vaccination Ms. Mulloy was an active 60-year-old retiree, who worked out daily and operated a paddle board business, with a non-contributory medical history. *See* Ex. 36 at 1; Petition at 1. Petitioner received a flu vaccine in her right arm[4] on October 31, 2018. Ex. 1 at 1.

On November 5, 2018, Ms. Mulloy presented to urgent care with a chief complaint of arm pain. Ex. 2 at 3. Petitioner reported that she "[h]ad flu vaccine [Wednesday]; 'really hurt'; pain did not go away . . . Sunday awoke & could not move right arm; has done ice and heat; 'side to side' movement is worse." *Id.* On exam, Petitioner had "full [range of motion] ROM. Positive for impingement sign. Rotator cuff has full strength." *Id.* at 4. The assessment was "right shoulder pain, examines as bursitis, this may be inflammatory secondary to Flu Vaccine?" *Id.* Petitioner was diagnosed with impingement syndrome of right shoulder, prescribed Naproxen, given rehab exercises, and advised to follow up with orthopedic if not improved. *Id.*

---

[3] At the end of the hearing held on January 27, 2023, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing. The transcript from the hearing is fully incorporated into this Decision.

[4] The vaccine administration record indicates that Petitioner's vaccination was administered in her left arm; however, Respondent does not contest that the vaccination was administered in her right arm. *See* Respondent's Report at 2, 9-10; Opp. at 2. Thus, the site of Petitioner's vaccination is not in dispute.

The next day (November 6, 2018), Ms. Mulloy presented to an orthopedist, Dr. Jeffrey Chase, with a chief complaint of right shoulder pain. Ex. 5 at 10. Petitioner reported "immediate pain" after having a flu shot, and that four days later, she had increased pain with use and intermittent shooting pain, not activity related. *Id*. Petitioner was assessed as having "acute pain of right shoulder" and "contusion of right shoulder" that was deemed "related to flu shot." *Id*. at 12. Shoulder x-rays were ordered, and the orthopedist recommended activity modification, ice, and time. *Id*.

On December 26, 2018, Ms. Mulloy received her first MRI of the right shoulder. Ex. 4 at 9. The MRI revealed "1. supraspinatus tendinosis without rotator cuff tear, 2. Extensively thickened, edematous joint capsule consistent with adhesive capsulitis. 3. Moderate subacromial subdeltoid bursitis." *Id*. On January 3, 2019, Petitioner returned to Dr. Chase to review her MRI. Ex. 10 at 1. Ms. Mulloy's pain was assessed at 6/10, made worse with movement and relieved with over-the-counter pain medication. *Id*. Petitioner received her first steroid injection at this visit and was referred to physical therapy (PT). *Id*. at 2-3; see also Ex. 6 at 5-6.

Ms. Mulloy received a physical therapy evaluation on January 8, 2019, with diagnoses of adhesive capsulitis and bursitis and partial bicep tear. Ex. 6 at 7. Petitioner rated her pain as 0-10 (sharp)/10, but prior to the steroid injection it was 4-5/10, at the lowest. *Id*. Petitioner was noted to have a 20-40% limitation based on clinical assessment. *Id*. at 8. In her first round of PT, Ms. Mulloy attended four sessions concluding on January 29, 2019, as she was leaving the area for several weeks. *Id*. at 10. Petitioner was educated on a home exercise program (HEP). *Id*. Petitioner noted on January 22, 2019, that her ROM had improved, but continued to complain of right shoulder pain and that she felt like the cortisone injection had worn off. *Id*. at 10, 13.

On January 25, 2019, Ms. Mulloy presented to the Jordan-Young Institute for a second opinion with Dr. Samuel Robinson, an orthopedic surgeon. Ex. 7 at 5-7. Dr. Robinson and Ms. Mulloy discussed treatment options which included, observation, behavior modifications, oral anti-inflammatory medication, physical therapy (with or without corticosteroid injections), as well as the possibility of surgical intervention. *Id*. at 6-7. Petitioner was instructed to return in two months. *Id*. at 7. Petitioner also had an unremarkable x-ray at this visit. *Id*. at 6. Two months later, on March 25, 2019, Petitioner returned to Jordan-Young, for a follow-up with PA Linda Liebold. *Id*. at 8. At this appointment, Petitioner indicated that she was interested in formal PT and another steroid injection to assist with PT. *Id*. Petitioner received her second steroid injection and was referred to PT. *Id*. at 8-10; Ex. 8 at 4.

Ms. Mulloy underwent a second PT evaluation on April 2, 2019. Ex. 8 at 5. At this evaluation, Petitioner reported that she had not been able to swim or sleep on her

stomach. *Id.* Petitioner rated her pain at 3/10 (aching) at best, and 10/10 (intense aching) at worst. *Id.* Petitioner was assessed as having adhesive capsulitis of her right shoulder due to decreased mobility of her right glenohumeral joint, impaired active and passive range of motion, weakness, decreased function, and difficulty performing ADL's. *Id.* at 6. One of Petitioner's long-term goals was to have less than 17% impairment and demonstrate decreased functional disability, which was 26% at the time of evaluation. *Id.* at 7. PT was recommended two times per week for six weeks. *Id.* At her last visit of PT on May 1, 2019, Petitioner's pain decreased to 0/10 at best, and 8/10 at worst, and her active and passive range of motion significantly improved; however, her upper extremity functional scale score indicated her impairment increased to 28%. *Id.* at 24-25. During the second round of PT, Petitioner attended a total of nine sessions. *Id.* at 25.

On May 2, 2019, Ms. Mulloy returned to Jordan-Young, where PA Liebold indicated that Petitioner was no longer making progress with PT. Ex. 7 at 11. Petitioner indicated that she wanted to pursue another MRI scan and surgical planning. *Id.* On May 17, 2019, Petitioner had a second MRI of her right shoulder, which revealed "1. Small partial bursal sided supraspinatus tendon tear at the level of the lateral acromion with associated mild subacromial/subdeltoid bursitis and mild supraspinatus and infraspinatus tendinosis. 2. Mild subscapularis tendinosis. 3. Split tear involving the long head of the biceps tendon in the bicipital groove. 4. Degenerative and SLAP tear extending into the anterior and anterior inferior glenoid labrum." Ex. 9 at 5-6.

On May 30, 2019, Ms. Mulloy returned to Dr. Robinson to review her MRI, and indicated that she wanted to consider surgical intervention. Ex. 17 at 2-3. On July 25, 2019, Dr. Robinson performed right shoulder arthroscopy with extensive glenohumeral joint debridement, subacromial decompression, distal clavicle resection, and rotator cuff repair. Ex. 11 at 5. Following her surgery, Petitioner wore her arm in a sling for approximately six weeks until September 9, 2019. Ex. 14 at 2. On September 9, 2019, Petitioner returned to PA Liebold for a repeat evaluation of her right shoulder and was prescribed the opioid Ultram. *Id.*

In the meantime, Ms. Mulloy received a third PT evaluation on August 9, 2019. Ex. 13 at 9. On evaluation, Petitioner's pain was rated at 1/10 at best (aching and sore) and 10/10 at worst (intense aching and sharp pain), and she demonstrated an 89% impairment. *Id.* By October 15, 2019, Petitioner's pain decreased to 0/10 at best and 6/10 at worst, and her impairment decreased to 49%. *Id.* at 53-54. PA Liebold ordered additional PT on November 4, 2019. Ex. 14 at 4; Ex. 13 at 1. At discharge on January 14, 2020, Petitioner's pain was 0/10 at best and 6/10 (intense aching with lifting her arm, and her impairment further decreased to 29%. Ex. 16 at 25-27. Petitioner attended a total of 44 sessions during her third round of PT. *Id.* at 25.

On January 20, 2020, Ms. Mulloy returned to PA Liebold where she stated, "[Petitioner] is struggling with the shoulder a bit more than I would have hoped. She is weak. She did have significant osteoarthritis at the time of surgery. Her cuff tissue was quite poor at the time of surgery as well. I do have concern with regards to the healing of the rotator cuff. I do think she is going to ultimately develop rotator cuff arthropathy and require additional procedures." Ex. 17 at 4.

On March 23, 2020, Ms. Mulloy underwent a magnetic resonance angiography (MRA) (Petitioner's third MRI) to evaluate the integrity of her previous shoulder repair. Ex. 21 at 4. The MRA revealed: "1. Status post supraspinatus/ infraspinatus repair with repeat full-thickness tear from the anterior supraspinatus through mid infraspinatus tendons at the enthesis, with up to 3.6 cm tendon retraction. Moderate supraspinatus and infraspinatus muscle volume loss with mild fatty infiltration. 2. Complete long head of biceps tendon tear at the biceps anchor. 3. Prior acromioplasty and distal clavicle resection. 4. Advanced glenohumeral osteoarthritis with multifocal grade 4 glenohumeral chondrosis." *Id.* On March 27, 2020, Petitioner had a telehealth visit with Dr. Robinson, where they discussed Petitioner having a total shoulder arthroplasty. *Id.* at 1. At that time, Petitioner chose to proceed with conservative measures including behavioral modifications and oral anti-inflammatories. *Id.*

On May 11, 2020, Ms. Mulloy followed up with again with PA Liebold, with continued pain at night and when using her arm. Ex. 21 at 5. Petitioner was administered her third steroid injection at this visit. *Id.*

On June 5, 2020, Ms. Mulloy presented to UNC Orthopaedics to see Dr. Robert Creighton. Ex. 20 at 62. Dr. Creighton noted that Petitioner's rotator cuff repair failed and recommended a right shoulder arthroscopy revision repair versus treatment with reverse shoulder arthroplasty. *Id.* On July 30, 2020, Dr. Creighton performed Petitioner's second right shoulder surgery, which included a right shoulder arthroscopy with rotator cuff repair with Smith & Nephew patch, extensive debridement, and small subacromial decompression. *Id.* at 73. Petitioner also received a peripheral nerve block at that time. *Id.* at 23-24.

On August 10, 2020, Petitioner had a post-operative visit with Dr. Creighton. Ex. 20 at 68. Given Petitioner's history of a failed rotator cuff repair, Dr. Creighton wanted to be cautious with his approach to PT. *Id.* Dr. Creighton indicated that a total shoulder replacement may be a possibility for Petitioner in the future, but explained that it was early in Petitioner's rehabilitation to make any definitive decisions. *Id.* On September 1, 2020, Petitioner had another follow-up visit with Dr. Creighton. Ex. 26 at 1. Dr. Creighton stated, "Overall she is doing better than she was prior to surgery but still having some limitation. She has some issues doing things over the shoulder but is very functional below her

shoulder level is able to play golf and do many things she was not able to do prior to this but certainly not back to normal. She is unable to throw or swim a freestyle stroke." *Id.* at 1-2. Petitioner also had x-rays done at this visit. *Id.*

Between August 18, 2020, and April 25, 2022, Petitioner attended 82 post-operative PT sessions. Ex. 24 at 15-34; Ex. 27 at 4-16; Ex. 28 at 2-18. On July 27, 2021, Petitioner's Quick Dash Disability score was 45.5%. Ex. 27 at 6. On August 31, 2021, Petitioner's physical therapist noted that Petitioner was getting frustrated with her deficits in functional strength and with ADLs and the pain she experienced daily. *Id.* at 7. On November 9, 2021, Petitioner's physical therapist gave her professional opinion that Petitioner would require a reverse total shoulder arthroplasty within the next five to ten years or sooner, and that "heavy ADLs may never be part of [Ms. Mulloy's] new normal, especially if it requires [right] arm to move higher than shoulder height." *Id.* at 11.

By April 25, 2022, Ms. Mulloy began to have left shoulder pain. Ex. 28 at 18. On May 3, 2022, Petitioner was recertified for PT for two times per week for twelve weeks. Ex. 34 at 2. Petitioner attended 14 PT sessions between May 3, 2022, and August 16, 2022. *Id.* at 3-16. On May 20, 2022, at Dr. Creighton's recommendation, Petitioner received a fourth MRI, this time of her left shoulder. Ex. 32 at 1; Ex. 33 at 1. Based on the MRI, Dr. Creighton recommended a primary care sports evaluation, high-volume saline injection, a corticosteroid injection, and then PT after the injection. Ex. 32 at 3. Petitioner received her fourth steroid injection on June 14, 2022. *Id.* Petitioner has continued receiving PT, through present, attending 17 additional PT sessions between August 19, 2022, and January 4, 2023. *See* Ex. 37.

### III.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional

distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579, 489-90 (2013). The *Graves* decision maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it emphasizes the need to focus on what the *petitioner* in question should rightfully receive, all things being equal (although it does not preclude consideration of what comparable other claimants received).

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### IV.   Appropriate Compensation in this Matter

#### A.  Past Unreimbursed Expenses

Petitioner requests $19,274.55 in past unreimbursed expenses. Reply at 7. Respondent, by contrast, proposes only reimbursing Petitioner a total of $4,124.27. Opp. at 2. The disputed amounts represent "charges for an in-home pool, CBD and turmeric powders, and a mileage charge for a telehealth visit." *Id.* at 23. At the Motions Day hearing, Petitioner's counsel explained that Ms. Mulloy is "a very natural person. She didn't want to take medication, that is why she is on some of these therapeutic natural things like CBD oil and turmeric oil and the pool."

At the outset, I note that CBD (cannabidiol) oil may not be covered by the Vaccine Program. On the federal level, cannabis remains illegal and may not legally be used for medical or recreational purposes. *See* 21 U.S.C. § 301, *et seq.*[6] Accordingly, the Vaccine Program, a creation of federal law, cannot lawfully pay for cannabis-related treatments.

Regarding the in-home pool, there is no evidence in the record that the pool was medically necessary, recommended, or required by any physician for Petitioner's SIRVA. Additionally, the fact that Petitioner previously had a pool undercuts her argument that the pool was necessary specifically to treat her SIRVA. Accordingly, I find that expenses related to the in-home pool are not compensable as part of damages.

I do find, however, that the turmeric was homeopathic and natural alternative to traditional medication (such as the over-the-counter anti-inflammatories and opioids that were recommended and prescribed by Petitioner's treating providers). Therefore, I find that associated expenses were reasonable and necessary pursuant to  Section 15(a)(1)(A), and expenses related to the turmeric are compensable as part of damages.

At the hearing, the parties were instructed to forward an updated calculation for Ms. Mulloy's unreimbursed medical expenses in light of my oral ruling. The parties reported that an award for unreimbursed expenses in the amount of $7,699.94 reflected the sums that were undisputed or that I had deemed allowable. Accordingly, I find that Petitioner is entitled to **$7,699.94** for past unreimbursed medical expenses.

#### B.  Past Pain and Suffering

In this case, Petitioner's awareness of her injury is not disputed, leaving only its severity and duration to be considered. In determining appropriate compensation for

---

[6] Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236.

Petitioner's pain and suffering, I have carefully reviewed and considered the complete record in this case. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating such cases. However, my determination is ultimately based upon the specific circumstances of this case.

Ms. Mulloy requests an award of $225,000.00. Br. at 1. She argues that she "has undergone two surgeries and three painful steroid injections in her right shoulder, none of which cured her of her pain and suffering" *Id.* at 10. Petitioner emphasizes that she experienced extreme pain immediately after the vaccination that prevented her from sleeping, and there were only occasional nights when the pain in her shoulder did not interrupt her sleep. *Id.* at 14. Petitioner also notes that within a few months of the vaccination, her right shoulder had a clinical assessment of a 20-40% limitation. *Id.* Petitioner argues that the severity of her SIRVA "necessitated extensive physical therapy - four rounds and over 100 sessions - not including the home exercise program that supplements [P]etitioner's formal PT sessions." *Id.*

In addition, despite extensive PT, Petitioner asserts that she "continues to experience significant pain, weakness, and mobility limitations in her right shoulder" and she is "now also suffering significant pain and debilitation in her other (left) shoulder." Br. at 14. Petitioner highlights the fact that her physical therapist concluded that she will require a total right shoulder replacement in the future, a possibility also discussed by her second orthopedic surgeon, Dr. Creighton. *Id.* at 14-15. Petitioner opined, "[w]hen two surgeries, three steroid injections (to the right shoulder), prescription medications, and more than 100 physical therapy sessions cannot eliminate her pain and return her to the life she had prior to her flu vaccination, it is indisputable that [P]etitioner's injury is very severe . . . ." *Id.* at 15 (footnote omitted).

Petitioner looks to comparative guidance for similar SIRVA cases where multiple surgeries were involved, including *Schoonover*, *Lawson*, and *Meirndorf*, and *McDorman*, all awarding damages between $200,000.00 and $205,000.00.[7] *See* Br. at 12-15. Petitioner argues "[a]mong all those cases, Ms. Mulloy's case is by far the most severe," as she "endured an extended period of pain and suffering that has neither been significantly helped by multiple surgeries, steroid injections, and extensive PT, but continues to be a painful part of her everyday existence." *Id.* at 18.

---

[7] *Schoonover v. Sec'y of Health & Hum. Servs.*, No. 13-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020) (awarding $200,000.00 for past pain and suffering); *Lawson v. Sec'y of HHS*, No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (awarding $205,000.00 for past pain and suffering); *Meirndorf* v. Sec'y of HHS, No. 19-1876V, 2022 WL 1055475 (Fed. Cl. Mar. 7, 2022) (awarding $200,000.00 for past pain and suffering); *McDorman v. Sec'y of HHS*, No. 18-804V, 2021 WL 5504698 (Fed. Cl. Apr. 5, 2021) (awarding $200,000.00 for past pain and suffering).

In response, Respondent recommends a past pain and suffering award of $170,000.00. Opp. at 2. Respondent devotes a significant portion of his response to a discussion of the Vaccine Act's statutory cap for pain and suffering damages awards. Otherwise, Respondent notes that "[a]lthough on September 1, 2021, [P]etitioner was reportedly not back to normal, she was deemed to be 'very functional' below the shoulder level, she was able to play golf, and she was able to do many of the things she was not able to do prior. . . . Records from as recently as May 26, 2022, seem to indicate that [P]etitioner's right shoulder condition was stable; [P]etitioner "state[d] that she is doing better in regards to her right shoulder and feels that the additional physical therapy and blood flow restriction has been helpful." Opp. at 20 (citing Ex. 32 at 2, 4).

Respondent also noted that "[P]etitioner's right shoulder x-ray of September 1, 2021, indicated the presence of moderate glenohumeral osteoarthrosis, a degenerative age-related condition, which was not related to petitioner's vaccination status." Opp. at 20 (citing Ex. 26 at 3). Respondent also highlighted the statement by Petitioner's physical therapist that she "will require" additional surgery in the next five to ten years, while probative, "this statement was made by [P]etitioner's physical therapist, and not her orthopedic physicians, who are silent in the records on the issue of a future surgery. Accordingly, such statement is speculative at the present time." *Id.* at 20-21 (citing Ex. 28 at 2).

In his brief, Respondent did not offer any comparable cases. However, at the hearing he allowed that *Pruitt v. Sec'y of Health & Hum. Servs., No. 17-757V, 2020 WL 5292022* (Fed. Cl. Spec. Mstr. Oct. 29, 2021), which awarded the petitioner $185,000.00 in pain and suffering, was analogous to the facts of Petitioner's case here. (Respondent thus, in effect, increased his offer at that time, thereby acknowledging the initial sum was a bit low).

*Pruitt* is useful as a starting point for determining damages, but ultimately is somewhat distinguishable. Although the *Pruitt* petitioner required two surgeries, there was a significant gap in treatment *plus* a gap between surgeries. Also, that claimant only received three steroid injections, and after her second surgery, there was no recommendation for continued treatment "since her pain is not constant and does not seem to be interfering with her life." *Pruitt*, 2020 WL 5292022, at *2-3, 8. Additionally, there was some question regarding whether her second surgery for a SLAP tear was a direct sequela of her vaccination. *Id.* at 9.

The comparable cases offered by Petitioner, on the other hand, present facts closer to Ms. Mulloy's case. In *Lawson*, the petitioner underwent an unprecedented three surgeries, seven steroid injections, four rounds of PT, six MRIs, and most recently started

PRP injections. *Lawson*, 2021 WL 688560, at *5. That petitioner was fired from her job following her SIRVA, after her first surgery she was unable to lift her arm above her head without crying, she lived with a constant ache of about 2/10, and her pain increased depending on her activity. *Id.* She was unable to go running, do certain exercise routines, or lay on her stomach with her arms outstretched. *Id.* However, it was noted that her pain had an intermittent character, and there were instances documented in the record where she did experience some relief from her pain. *Id.* at *6.  Also, it was ambiguous whether her most recent surgical intervention was related to her SIRVA or something else. *Id.* Respondent argues that the *Lawson* award of $205,000.00 "makes clear that [P]etitioner's demand for past pain and suffering alone (i.e., not including her future pain and suffering demand) of $225,000.00, or $20,000.00 more than Ms. Lawson received, is not justified." Opp. at 21.

In *Meirndorf,* the petitioner underwent two surgeries, five laser treatments, two joint injections, two shoulder MRI scans, and two separate arthroscopic surgeries over several years. *Meirndorf*, 2022 WL 1055475, at *2. That claimant described her pain as constant, worsening, and interfering with her ability to work (on the computer), and drive due to discomfort. *Id.* Her condition had improved, however, by her final treatment session. *Id.* at *3. The *Meirndorf* petitioner was the mother of two at the time of vaccination, and detailed the limitations she experienced in her overall enjoyment of life, physical activities, work duties, and exercise of daily functions attributable to her injuries. *Id.* Petitioner's injury had a severe effect on her mental state, and she became depressed, hopeless, and angry, and she was awarded $200,000.00 in past pain and suffering. *Id.* at *3, 4.

The *McDorman* petitioner underwent a significant amount of treatment for her injury for over two years, to include: multiple rounds of physical therapy (50 sessions), ten steroid injections, an MRI scan, and two separate arthroscopic surgeries. *McDorman*, 2021 WL 5504698, at *2. While her reported pain levels varied significantly (at times relatively high, but also fairly low on other occasions), the pain was persistent enough to cause her to seek out, and receive, a significant amount of medical treatment. *Id.* at *3. Respondent appears to concede that Petitioner's reliance on *McDorman*, a case where the petitioner was award $200,000.00, was particularly instructive, "as Ms. McDorman also underwent two surgical procedures and developed pain in her opposing shoulder due to overuse." *Id.* (citing *McDorman*, 2021 WL 5504698 at *2, 4). Respondent, however, distinguishes *McDorman*, noting that this petition er received ten steroid injections. *Id.*

In *Schoonover,* the petitioner reported constant pain, she had pain at rest, and she often described pain with activity as severe, with a rating of eight out of ten. *Schoonover*, 2020 WL 5351341, at *4. Her pain did not improve following multiple steroid injections, and she had two surgeries, but she continued to have pain, she underwent lengthy and significant medical and surgical care and treatment and suffered episodes of severe pain

and limited mobility. *Id.* at \*4-5. This petitioner was awarded $200,000.00 in past pain and suffering, and $1,200.00 per year for her life expectancy, reduced to net present value. *Id.* at \*6. Comparing Ms. Mulloy's injury with that of the Petitioner in *Schoonover*, Respondent argues that "[P]etitioner did experience at least some level of recovery, as she is able to complete simple ADLs, can travel, and swim with a modified stroke," unlike Ms. Schoonover, who had "permanent limitations that significantly impacted her work, and her planned 'dream job' as a transport respiratory therapist was no longer an option." Opp. at 21 (citing *Schoonover,* at \*6).

While Ms. Mulloy was retired at the time of her injury, she describes in her affidavit how her SIRVA has changed her life forever. Ms. Mulloy explains—

> Prior to the shot I was an extremely fit and active person. I have trained for and competed in triathlons, ½ marathons, marathons, and open ocean stand up paddle races. My husband and I have been working out on a daily basis since we were married 38 years ago. Fitness is a way of life for us. We started and operated Outer Banks Stand Up Paddle for 11 years. My ability to work out has been seriously curtailed and I can no longer participate in activities that I love. My ongoing shoulder pain, now in both shoulders, has affected not only my workouts, emotional state, social life but my sleeping as well.
>
> . . . .
>
> Unlike Ms. Schoonover that lost her 'dream job' as a therapist, I have lost the remainder of my life to enjoy the recreational activities that I had worked so hard to achieve. Ms. Schoonover was also compensated with a 40% permanent disability for her non-dominant arm. According to the VA, a dominant arm as in my case, would receive a 10% higher value.
>
> My loss includes sharing these recreational activities and other activities such as pickleball with my three children and six grandchildren (ages 10, 7, 5, 2, 5 months and 3 months). Right now, I have difficulty holding my youngest grandchildren for any duration and can't even consider lifting the older ones.

Ex. 36 at. 1-2.

Although none of the cases cited herein by either side are precisely on point, the totality of evidence does suggest an award closer to what Petitioner requests is most appropriate - although I agree with Respondent that  $225,000.00 is not justified. In the comparable cases cited, there are some ways in which the treatment those petitioners

received was more extensive than the treatment Ms. Mulloy received – but I balance this against Ms. Mulloy's very difficult treatment course, especially considering the loss of enjoyment of her active lifestyle, the disability of her shoulder, the amount of PT she has had, the lengthy duration of her injury, and the constant nature of her pain, all of which were, in some cases, far more extensive than that of the other petitioners.

Thus, and pursuant to my oral ruling on January 27, 2023 (which is fully adopted herein), **I find that $205,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering.**

### C. Future Pain and Suffering

Petitioner asserts that "because there appears to be no hope that even shoulder replacement surgery will fully restore [her] to the fully independent and active woman she was prior to the flu vaccination, [she] also seeks an award for future pain and suffering in the amount of $1,500.00 per year for the remainder of [her] life." Br. at 19. Respondent agrees that a future pain and suffering component is appropriate in this case, but proposes a one-time award of $7,500.00. Opp. at 2.

I am generally reluctant to award future pain and suffering in SIRVA cases, unless there is compelling evidence in the medical record that a treating provider has confirmed a permanent form of loss. Here, such evidence exists (as underscored by Respondent's rare concession that some amount of future pain and suffering is warranted in this case). Ms. Mulloy has consistently had a functional disability/impairment of her shoulder between 89% (shortly after surgery) at worst, and 26% at best, with the most recent Quick Dash Disability/Symptom score of 45.5% on July 27, 2021. *See* Ex. 8 at 7, 24; Ex. 13 at 11, 54; Ex. 16 at 26; Ex. 27 at 6.

I do note that there is no statement in the record from a treating provider that Ms. Mulloy has suffered a permanent disability. Nevertheless, Petitioner has made a good argument for why she expects additional treatment in the future, including a possible third surgery. Considering what is likely a permanent shoulder disability, and the high probably that she will require additional treatment for her shoulder in the future, I award Petitioner **$900.00 per year for the remainder of her life**, which accepting Petitioner's calculation over a 22-year period, comes out to $19,800.00.[8]

In keeping with Vaccine Program practice, however, I must next reduce this

---

[8] The Social Security Administration (SSA) calculates life expectancy. Their life expectancy calculator can be found at https://www.ssa.gov/OACT/population/longevity.html (last visited February 17, 2023). According to SSA's life expectancy calculator, Ms. Mulloy has an additional life expectancy of 21.7 years. She is expected to live to be 86.6 years old. *Id.*

$19,800.00 figure to its net present value. See Section 15(f)(4)(A) (requiring that future compensation awards be reduced to their net present value). The parties were instructed to inform me of their proposed net discount rate. Petitioner recommended a one percent net discount rate over the 22-year future period, while Respondent argues for a two percent net discount rate.

Consistent with my reasoning in *Dillenbeck*, adopting a multiprong approach to account for the fluctuating treasury interest rates of present day is appropriate for determining the net discount rate in this case. *See Dillenbeck v. Sec'y of Health & Hum. Servs.*, No. 17-428V, 2019 WL 4072069, at *15 (Fed. Cl. July 29, 2019) (adopted a multi-pronged approach in order to account for the unusually low treasury interest rates of present day, utilizing a one percent net discount rate for the first fifteen years of this award, followed by a two percent net discount rate for the remaining seven years). I will do the same herein, and also utilize a one percent net discount rate for the first fifteen years of the award, followed by a two percent net discount rate for the remaining seven years. Applying this multi-pronged net discount rate, Petitioner's $19,800.00 award for future pain and suffering will be $16,688.12.[9]

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, I find that **$205,000.00 represents a fair and appropriate amount of compensation for Ms. Mulloy's past pain and suffering.** I find that and award of **$900.00 per year, reduced to net present value of $16,688.12**, is appropriate compensation for future pain and suffering. **I also find that Petitioner is entitled to $7,699.94 for past unreimbursed medical expenses.**

---

[9] This figure was calculated in Microsoft Excel using the present value or "PV" function. The PV function syntax is: PV (rate ($r$), number of payment periods ($n$), payment amount (PMT), future value (FV) (optional), and type (optional)). In other words, $PV = FV / (1+ r)^n + PMT / r [1 - 1/ (1+ r)^n]$. In this case, $r = 0.01$ (years 1-15) or 0.02 (years 16-22); PMT = $900.00; $n = 1$; FV is variable, and the "type" was not used for these calculations.

Each year (22 years representing Petitioner's expected future life expectancy) was calculated separately (in an individual cell) using the same syntax, which resulted in the present value of the award for the current year, and the future value of the award for the subsequent year. The first 15 payments (or years) were calculated using a 1% discount rate, 1 payment period, $900.00 payment amount, with the future value being the value of the previous year's award. Beginning with payment/year 16, payments 16 through 22 were calculated using a 2% discount rate, 1 payment period, $900.00 payment amount, with the future value being the value of the previous year's award.

Accordingly, **I award Petitioner a lump sum payment of $229,388.06 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under § 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.